UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

INTERLINE BRANDS, INC.,

    *Plaintiff,*

vs.      CASE NO._____

AIG SPECIALTY INSURANCE COMPANY,
f/k/a Chartis Specialty Lines Insurance Company,
f/k/a American International Specialty Lines Insurance
Company; LIBERTY MUTUAL FIRE INSURANCE
COMPANY; LIBERTY INSURANCE
CORPORATION,

    *Defendants.*

_____/

## COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Interline Brands, Inc. ("Interline"), sues AIG Specialty Insurance Company ("AIG"), formerly known as Chartis Specialty Insurance Company ("Chartis") and American International Specialty Lines Insurance Company ("AISLIC"), Liberty Insurance Corporation ("Liberty Insurance"), and Liberty Mutual Fire Insurance Company ("Liberty Fire") (collectively, "Liberty") as follows:

### NATURE OF ACTION

1. This is an action for declaratory relief and damages, pursuant to 28 U.S.C. §§ 2201 and 2202, arising out of the refusal of AIG and Liberty to unconditionally indemnify and defend Interline in relation to, currently, eleven underlying actions and other cases of a like nature for property damage allegedly caused by Interline's distribution of what are claimed to be defectively designed water supply lines.

## PARTIES, JURISDICTION AND VENUE

2.      Interline is a New Jersey corporation with its principal place of business in Jacksonville, Florida. Interline at all material times transacted business in Duval County, Florida.

3.      AIG is, upon information and belief, an Illinois corporation with its principal place of business in New York, New York and is doing business in the State of Florida.

4.      Liberty Fire is, upon information and belief, a Wisconsin corporation with its principal place of business in Boston, Massachusetts and is doing business in the State of Florida.

5.      Liberty Insurance is, upon information and belief, an Illinois corporation with its principal place of business in Boston, Massachusetts and is doing business in the State of Florida.

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a), as the parties' respective states of incorporation and principal places of business are diverse, thus establishing diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) because the insurance policies described below were all issued for delivery and delivered to Interline in this District; the causes of action accrued in this District; Interline's principal place of business is in this District; AIG and Liberty conduct business in this District; and a substantial part of the events or omissions giving rise to the claims under the subject policies occurred in this District.

## THE POLICIES

8.      <u>The AIG Primary Policies</u>:  AIG issued a series of five consecutive annual

commercial general liability policies to Interline, all bearing Policy No. 2067728, and covering the time period November 1, 2007 to November 1, 2014 ("Primary Policies").

9. Prior to changing its name to AIG Specialty Insurance Company and assuming the rights and obligations of its predecessor entities, AIG was known as AISLIC and/or Chartis. The Primary Policies issued for the period of November 1, 2007 to November 1, 2010 were issued by AIG while operating as AISLIC; the Primary Policies issued for the period of November 1, 2010 to November 1, 2014 were issued by AIG while operating as Chartis.

10. The Primary Policies' material terms are identical, including the relevant coverage grants and exclusions. A copy of one of the Primary Policies, issued for the period of November 1, 2007 to November 1, 2008, is attached as Exhibit A.

11. The Primary Policies were issued for delivery to and delivered to Interline in Jacksonville, Florida.

12. Interline paid the full premiums on the Primary Policies and satisfied all other conditions to maintain the Primary Policies in full force and effect at all relevant times.

13. The Primary Policies afford $1,000,000.00 each occurrence, $2,000,000.00 general aggregate, and $2,000,000.00 products completed operations aggregate limits.

14. The deductible for Coverage A (Bodily Injury and Property Damage Liability) is $75,000.00 each occurrence and applies to indemnity only. Legal fees and other defense costs do not erode this deductible, and are paid outside of and in addition to the limits of the Primary Policies.

15. Under the terms of the Primary Policies, AIG agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of … **property damage** …" occurring "during the policy period" and "caused by an **occurrence**" and to "defend the insured

3

against any **suit** seeking those damages." AIG's duty to defend "ends when [AIG] has used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B."

16. Under the terms of the Primary Policies, "Property Damage" means "[p]hysical injury to tangible property, including all resulting loss of use of that property. All such loss shall be deemed to occur at the time of the physical injury that caused it; or "[l]oss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **occurrence** that caused it."

17. Under the terms of the Primary Policies, "Occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

18. The Liberty Fire Umbrella Excess Policies: Liberty Fire issued three consecutive annual Umbrella Excess Liability policies to Interline, all bearing policy number TH2-631-509477, and covering the period of November 1, 2007 to November 1, 2011 ("Liberty Fire Policies"). The Liberty Fire Policies' material terms are identical, including the relevant coverage grants and exclusions. A copy of one of the Liberty Fire Policies, issued for the period of November 1, 2007 to November 1, 2008, is attached as Exhibit B.

19. The Liberty Fire Policies provide $25,000,000.00 per occurrence, $25,000,000.00 general aggregate and $25,000,000.00 products-completed operations aggregate limits with a "Retention" of $25,000.00.

20. The insuring agreement in the Liberty Fire Policies, as amended by Endorsement, requires Liberty Fire to "pay those sums in excess of the **retained limit** that the insured becomes legally obligated to pay as damages because of ... **property damage** ..." occurring "during the

4

policy period" and "caused by an **occurrence**" and to "defend any **suit** seeking damages covered by [the] policy."

21. Under the terms of the Liberty Fire Policies, "Property damage" means "[p]hysical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or "[l]oss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **occurrence** that caused it."

22. Under the terms of the Liberty Fire Policies, "Occurrence" with respect to property damage means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

23. Under the terms of the Liberty Fire Policies, "Retained limit" means, as to each occurrence, "the relevant 'each person,' 'each occurrence' or similar limit or sublimit of liability in [any **underlying policy**]; plus [a]ll amounts payable under other insurance, if any; but not less than the amount shown in the Declarations as the Insured's Retention" and is "reduced by the amount the relevant limit or sublimit stated in the applicable underlying policy is reduced due to the impairment or exhaustion of an overriding aggregate limit of liability."

24. Under the terms of the Liberty Fire Policies, "Underlying Policy" means "a policy listed as an **underlying policy** in the Declarations."

25. The Liberty Fire Policies identify the AIG Primary Policies covering November 1, 2007 to November 1, 2011 as "Underlying Policies."

26. <u>The Liberty Insurance Umbrella Excess Policies</u>: Liberty Insurance issued two consecutive Umbrella Excess Liability policies to Interline, all bearing policy number TH7-631-509477, and covering the period of November 1, 2011 to November 1, 2014 ("Liberty Insurance

Policies"). The Liberty Insurance Policies' material terms are identical, including the relevant coverage grants and exclusions. A copy of one of the Liberty Insurance Policies, issued for the period of November 1, 2011 to November 1, 2012, is attached as Exhibit C.

27. The Liberty Insurance Policies provide $25,000,000.00 per occurrence, $25,000,000.00 general aggregate and $25,000,000.00 products-completed operations aggregate limits with a "Self-Insured Retention" of $25,000.00.

28. Under the Liberty Insurance Policies, Liberty agreed to "pay those sums in excess of the **retained limit** that the insured becomes legally obligated to pay because of … **property damage** …" occurring "during the policy period" and "caused by an **occurrence**."

29. Liberty Insurance also agreed to "defend any **suit** seeking damages covered by this insurance … when: (1) The total applicable limits of **underlying insurance** have been exhausted by payment of judgments or settlements; or (2) The damages sought because of … **property damage** … to which this insurance applies would not be covered by **underlying insurance** or other insurance."

30. Under the Liberty Insurance Policies, "Property damage" means "[p]hysical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or [l]oss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **occurrence** that caused it."

31. Under the Liberty Insurance Policies, "Occurrence" means, with respect to property damage, "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

32. Under the Liberty Insurance Policies, "Retained limit" means as to each occurrence ... "[t]he total applicable limits of the **underlying insurance** plus any applicable **other insurance**" and is "reduced by the amount by which the applicable **underlying insurance** has been reduced due to the reduction or exhaustion of the applicable aggregate limit of insurance by payment of judgments or settlements. The **retained limit** is not reduced or exhausted by defense costs, loss adjustment expenses, supplementary payments or similar amounts that reduce or exhaust the policy limits of **underlying insurance**."

33. Under the Liberty Insurance Policies, "Underlying Insurance" means "any policies of insurance or self-insurance listed in the Declarations under the Schedule of **underlying insurance**."

34. The Liberty Insurance Policies list the AIG Primary Policies covering November 1, 2011 to November 1, 2014 as "Underlying Insurance."

## THE UNDERLYING LAWSUITS AND CLAIMS

35. A series of ten "bundled" subrogation lawsuits and one individual lawsuit were brought by the Law Offices of Robert A. Stutman, P.C. in New Jersey on behalf of various insurance carriers – including Liberty Fire and Liberty Insurance – as subrogees of their insureds, alleging products liability, failure to warn, breach of warranty, strict liability, and fraudulent concealment against Interline and various manufacturers and distributors of water supply lines ("Underlying Lawsuits").

36. In addition to the individual claims asserted against Interline in the Underlying Lawsuits, Interline is defending numerous other cases of a like nature relating to property damage incurred as a result of allegedly defective water supply lines (the "Outstanding Claims").

37. The water supply lines at issue in the Underlying Lawsuits and Outstanding Claims were designed and manufactured by entities other than Interline. Interline does not design or manufacture any water supply lines, but sells certain supply lines to its customers under its private label name, Durapro.

38. The eleven Underlying Lawsuits, which consist of 218 individual claims (41 of which allege property damage occurring in Florida including some of the claims for which subrogation is sought by Liberty), are currently styled as follows:

   a) *American Mercury Insurance Co. et al. v. Interline Brands, Inc. et al.*, No. 001942-13 (N.J. Super. Ct. Law Div. 2013);
   b) *Cincinnati Insurance Co. v. Interline Brands, Inc. et al.*, No. 001941-13 (N.J. Super. Ct. Law Div. 2013);
   c) *Erie Insurance Exchange et al. v. Interline Brands, Inc. et al.*, No. L216-13 (N.J. Super. Ct. Law Div. 2013);
   d) *First Liberty Insurance Corp. v. Interline Brands, Inc. et al.*, No. L-007652-12 (N.J. Super. Ct. Law Div. 2012);
   e) *Liberty Lloyds of Texas Insurance Co. v. Interline Brands, Inc. et al.*, No. L219-13 (N.J. Super. Ct. Law Div. 2013);
   f) *Liberty Mutual Fire Insurance Co. v. Interline Brands, Inc. et al.*, No. L007653-12 (N.J. Super. Ct. Law Div. 2012);
   g) *Safeco Insurance Co. of America et al. v. Interline Brands, Inc. et al.*, No. 001944-13 (N.J. Super. Ct. Law Div. 2013);
   h) *United Services Automobile Association et al. v. Interline Brands, Inc. et al.*, No. L-845-13 (N.J. Super. Ct. Law Div. 2013);
   i) *United Services Automobile Association a/s/o Emmet T. Mannix v. Interline Brands, Inc. et. al.* No. L-303-13 (N.J. Super. Ct. Law Div. 2013);
   j) *Westfield Insurance Co. v. Interline Brands, Inc. et al.*, No. 1:12-cv-06775-JBS-JS (D. N.J. 2012); and
   k) *Liberty Insurance Corp. et al. v. Interline Brands, Inc. et al.*, No. ATL-L-452-14 (N.J. Super. Ct. Law Div. 2014).

The Underlying Lawsuit Complaints, and amendments[1] thereto, are attached as Composite Exhibit D.

39. The Underlying Lawsuits and Outstanding Claims arise from Interline's alleged distribution of water supply lines claimed to be defective, which allegedly failed and caused property damage. The alleged property damage spans from September 7, 2007 to January 23, 2014.

40. The Plaintiffs in the Underlying Lawsuits, including Interline's own insurers (Liberty Insurance and Liberty Fire), seek damages exceeding $7.8 million[2] and other relief for the harm allegedly caused by Interline's acts or omissions. The Outstanding Claims likewise seek substantial damages from Interline.

41. Until recently, the water supply line claims appeared to be isolated and, in any event, within the standard deviation for the failure of this type of product.

42. Some of the claims arising out of Interline's distribution of the allegedly defective water supply lines settled at a time when it was not clear that the lawsuits bore common characteristics and were not merely isolated events.

43. Until recently, Interline has been defended and indemnified by the suppliers from whom Interline purchased its water supply lines. One of those suppliers, however, has recently informed Interline that it is presently unable to fully indemnify or defend Interline due to financial issues.

---

[1] The Plaintiffs in the Underlying Lawsuits filed a First Amended Schedule "A" to the Complaints identified in subsection (a) through (h) above.

[2] This figure is based on a damages spreadsheet produced by the Law Offices of Robert A. Stutman, P.C. to Interline on March 14, 2014 (the "Spreadsheet"). The number of claims and dates of loss set forth in paragraphs 38 and 39 are also based on the updated information contained in the Spreadsheet.

44. Interline timely notified AIG and Liberty (which already knew of the claims) of, and requested that each insurer defend and indemnify it with respect to, the Underlying Lawsuits and Outstanding Claims.

45. AIG agreed to defend Interline with respect to some, if not all, of the Underlying Lawsuits under a purported reservation of rights. AIG's reservation of rights letters with respect to two of the Underlying Lawsuits are attached as Composite Exhibit E.

46. Interline itself has paid close to $75,000.00 toward exhaustion of its contractual deductible obligation and any applicable retention[3], and jointly liable parties have paid substantial additional sums, serving to fully erode Interline's deductible and any applicable retention.

47. Liberty has thus far declined to defend or indemnify Interline entirely, claiming, amongst other things, that Interline failed to provide timely notice under the Liberty Insurance and Liberty Fire Policies. Liberty's partially redacted denial letter, in which it purportedly reserved its right to modify its position, is attached as Exhibit F.

48. Mediation of the Underlying Lawsuits is scheduled for early June 2014. In light of the looming mediation, the refusal of jointly and principally liable parties other than Interline to fully protect and hold Interline harmless, the nearly $8 million being sought in the Underlying Lawsuits, and numerous Outstanding Claims which likewise seek substantial damages relating to property damage incurred as a result of allegedly defective water supply lines, an impending settlement well in excess of the limits of at least one of the underlying Primary Policies is reasonably likely.

---

[3] The Liberty Fire Policies refer to a "Retention," whereas the Liberty Insurance Policies refer to a "Self-Insured Retention."

10

49. All conditions precedent to this action have been performed, waived, or are the subject of an estoppel.

50. Interline has engaged counsel to represent its interests in this action and is obligated to pay the firm a reasonable fee.

### COUNT I: DECLATORY RELIEF – AIG

51. Interline re-alleges paragraphs 1 through 50.

52. Interline made timely payment of all premiums and otherwise satisfied all conditions precedent for coverage under the Primary Policies.

53. The Primary Policies constitute valid and enforceable contracts under the laws of the State of Florida.

54. The Primary Policies require AIG to defend and indemnify Interline against third-party claims alleging "property damage" occurring "during the policy period" which is "caused by an occurrence."

55. The eleven Underlying Lawsuits and Outstanding Claims seek damages for "property damage" occurring during the policy period, caused by an "occurrence."

56. No exclusions, including exclusions identified in Composite Exhibit E attached hereto, apply under the circumstance to relieve AIG of its duties to defend and indemnify Interline in relation to the Underlying Lawsuits or to Outstanding Claims.

57. AIG is therefore obligated to defend and indemnify Interline with respect to the Underlying Lawsuits and Outstanding Claims, but continues to disagree with Interline's position and, while providing a defense, maintains its right to deny coverage under the Primary Policies.

58. Specifically, AIG disagrees with Interline that the Underlying Lawsuits and Outstanding Claims arise from a single occurrence, being the distribution in commerce by Interline of a product containing a like alleged design or manufacturing defect.

59. Further, AIG disagrees with Interline as to:

a) how, and to what extent, payments by Interline and/or other liable parties exhaust Interline's deductible obligations, to the extent remaining;

b) how, and to what extent, AIG's obligation to indemnify is to be calculated, including whether one, or more than one, policy is triggered by payment of settlements or judgments, including the role, if any, of policy provisions designed to collapse continuing harm into a single policy period;

c) when, and under what circumstances, AIG's per-occurrence and aggregate limits exhaust, thus affecting the obligations of Liberty; and

d) the extent and nature of AIG's defense obligations given resolution of these issues.

60. Interline believes that there is a single occurrence presented by the Underlying Lawsuits and Outstanding Claims, that it has exhausted its deductible obligations, and that AIG must completely defend – pending exhaustion of limits – Interline's interests.

61. Accordingly, an actual and justiciable controversy exists among the parties as to which a declaratory judgment setting forth their respective rights and obligations under the Primary Policies in relation the Underlying Lawsuits and Outstanding Claims is necessary and appropriate.

## COUNT II: DECLATORY RELIEF – LIBERTY

62. Interline re-alleges paragraphs 1 through 50.

63. Interline made timely payment of all premiums and otherwise satisfied all

12

conditions precedent for coverage under the Liberty Insurance and Liberty Fire Policies (collectively, the "Liberty Policies"), including timely notice.

64. The Liberty Policies constitute valid and enforceable contracts under the laws of the State of Florida.

65. The Liberty Policies require both Liberty Insurance and Liberty Fire to indemnify Interline for damages incurred in excess of the applicable Primary Policies for "property damage" occurring "during the policy period" that is "caused by an occurrence." The Liberty Policies also require both insurers to defend Interline against any third-party claim asserting "property damage" occurring "during the policy period" "caused by an occurrence."

66. The eleven Underlying Lawsuits and Outstanding Claims seek damages for "property damage" occurring during the policy period, caused by an "occurrence," and collectively well exceed the limits of one of the Primary Policies.

67. No exclusions, including exclusions identified in Exhibit F attached hereto, apply under the circumstances to relieve Liberty Insurance or Liberty Fire of their duties to defend and indemnify Interline in relation to the Underlying Lawsuits or Outstanding Claims.

68. Liberty Insurance and Liberty Fire themselves have sued Interline as subrogees in two of the Underlying Lawsuits, which presents inherent conflicts of interest here.

69. Both Liberty Insurance and Liberty Fire have extensive knowledge independently learned of the Underlying Lawsuits and Outstanding Claims and the basis for such claims, which the carriers seem bent on using against their own insured. Such knowledge, Interline believes, defeats an assertion by Liberty Insurance and Liberty Fire of late notice or prejudice from such allegedly delayed notice.

70. Liberty Insurance and Liberty Fire have and had actual and/or constructive knowledge of the claims against Interline long before the Marsh letter referred to in their lengthy reservation of rights/denial letter, but never offered any assistance to Interline in managing or resolving these claims.

71. Liberty Insurance and/or Liberty Fire asserted claims (as the subrogating insurer on behalf of the insured homeowner) against Interline at least as early as January 2012.

72. Further, Liberty Insurance and/or Liberty Fire have had notice of property damage claims involving losses alleged caused by Interline's products at least as early as May 2008.

73. Liberty Insurance and Liberty Fire conducted lengthy internal investigations of Interline's liability and defenses to property damage claims in connection with the aforementioned claims.

74. Liberty Insurance was further aware of the Outstanding Claims at least as early as October 2012 in connection with Interline's policy renewals.

75. Interline believes that the allegations in the Underlying Lawsuits and Outstanding Claims are one "occurrence" as defined by the Liberty Policies and under applicable law. Liberty Insurance and Liberty Fire feign ignorance of what that "occurrence" might be, despite having sued their own insured, thus disagreeing with this position.

76. Liberty Insurance and Liberty Fire also claim that certain provisions in the Liberty Policies may operate to collapse continuing harm into one of the insurance policy terms, but have not taken a position as to whether this impacts the AIG Primary Policies, and if so, how, or which if any of the Liberty Policies should respond.

77. Liberty Insurance and Liberty Fire assert that there are upwards of 20 reasons they may not provide defense or indemnity to Interline as disclosed by Exhibit F; Interline disagrees that any of these asserted reasons for limiting or denying coverage apply.

78. Currently, Interline is exposed to nearly $8 million in damages sought in the Underlying Lawsuits, which far exceeds the limits of at least one of the Underlying Primary Policies, and additional damages in Outstanding Claims which, by themselves, exceed the limits of one or all of the applicable Primary Policies. Given this exposure, and the approaching mediation, Liberty owes Interline a fiduciary obligation to assist Interline in resolving these suits and in negotiating in good faith towards settlement.

79. Despite both Liberty Insurance and Liberty Fire's obligations, both insurers have refused to contribute funds toward Interline's defense of the Underlying Lawsuits and Outstanding Claims, or otherwise participate or negotiate in the process.

80. Accordingly, an actual and justiciable controversy exists among the parties as to which a declaratory judgment setting forth their respective rights and obligations under the Liberty Policies in relation the Underlying Lawsuits and Outstanding Claims is necessary and appropriate.

**WHEREFORE**, Interline Brands, Inc. prays for entry of judgment declaring the rights and interests of the parties in the issues and for the reasons described above, and if necessary to provide full relief, awarding damages to Interline to the extent it has paid or agreed to pay any sums which should be borne by some or all of the insurers, interest on such sums as provided by law, legal fees if allowed by law, including Section 627.428 of the Florida Statutes, and such other and further relief as may be equitable, just, and proper.

## TRIAL BY JURY

Interline demands a trial by jury of all issues so triable as a matter of right.

Dated this 11th day of April, 2014.

Respectfully submitted,

_____
**R. Hugh Lumpkin**
Florida Bar No. 308196
rlumpkin@vpl-law.com
**Ashley Hacker**
Florida Bar No. 71924
ahacker@vpl-law.com
**Arya Attari**
Florida Bar No. 58847
aattari@vpl-law.com
**Christopher T. Kuleba**
Florida Bar No. 105302
ckuleba@vpl-law.com
VER PLOEG & LUMPKIN, P.A.
COUNSEL FOR PLAINTIFFS
100 S.E. 2nd Street, 30th Floor
Miami, Florida 33131
Telephone: (305) 577-3996
Facsimile: (305) 577-3558